# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00526-CV

---

**A. R., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
NO. C2021-0449B,
THE HONORABLE CHARLES A. STEPHENS II, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant A.R. (Mother) appeals from the district court's order terminating her parental rights to A.P. (Daughter), born August 8, 2017. In a single issue on appeal, Mother challenges the sufficiency of the evidence supporting the district court's findings that she endangered Daughter and that termination of her parental rights was in Daughter's best interest. We will affirm the district court's order.

## BACKGROUND

On the morning of March 14, 2021, police and emergency personnel responded to a call of a possible cardiac arrest and drug overdose at a New Braunfels residence occupied by

Mother and Daughter's father, M.P. (Father).[1]  Paramedic Michael Thibodeaux testified that when he arrived at the scene, he observed Father on the floor in the living room, "an older gentleman and older lady," later identified as Father's parents, in the kitchen area, and Mother in the hallway.  Thibodeaux began assessing Father's condition and determined that he was unconscious but not in cardiac arrest.  It was dark in the house and Thibodeaux asked for more lighting so that he could better assess Father's condition, but he was told by the other people inside that "the lights didn't work."  Father then regained consciousness and Thibodeaux checked Father's vitals, determined that he was stable, and transported him outside on the stretcher for further assessment.  Thibodeaux testified that when Father was placed in the ambulance, "he was able to answer questions but appeared to be altered in a way. . . .  He, at one point, stated that he thought people were touching him when no one around him was actually touching him."  Based on Father's behavior inside the ambulance, which included "incomprehensible words" and attempting to "tear off" the medical-evaluation equipment, and Father's physical symptoms, which included constricted pupils and reportedly vomiting immediately before his collapse, Thibodeaux suspected that Father might have overdosed on drugs.

Thibodeaux further testified that although he had not observed any children inside the residence while he was there, he did not believe that the home was a safe environment for children.  The home did not appear to him to be a "maintained structure."  He testified that it was difficult to get the stretcher inside the residence: "The door was locked.  We were trying to get it

---

[1] Father's parental rights to Daughter were also terminated in the proceedings below, but he is not a party to this appeal.

open. The—the door and whole side of the building about came loose, just trying to open the door. It was very shabby. Well—not maintained." He explained further,

> The lack of light in the—in the building made everything very dark and not very accessible. The front door, with the side of the building being very weak and almost breaking it. [And] just the . . . ability of trying to pull the door open was shaking the whole side of the building.

Deputy Joseph Hernandez of the Comal County Sheriff's Office also responded to the call. Hernandez testified that when he arrived, Father was "incoherent," "moaning," and "rolling back and forth from his back to his left side" on the floor in the living room. Hernandez spoke with Mother, who explained to Hernandez that she and Father had gone to San Antonio the previous night with a man nicknamed "Benny," who "had been known in the past to possibly put substances in other people's drinks," and that on their way home, Father began "acting drunk and not feeling well," which Mother attributed to Father's consuming energy drinks that possibly contained Xanax. After they arrived home, she and Father began having sex, but Father "hit his head against a metal bar to a nightstand," "[b]ecame a little disoriented," and eventually "collapsed in the living room." Hernandez suspected that Father had been under the influence of some substance.

Hernandez testified that Mother told him that when Father collapsed, Daughter was asleep in the house. Hernandez did not observe the child while he was in the residence, but he had observed a small child's mattress on the floor in Mother's and Father's bedroom, near a larger, adult mattress. The bedroom contained "a power surge protector on the floor with multiple electrical cords going into it, and it had a blanket draped over it," and there was a chain bolted to the outside of the bedroom door frame. Hernandez also observed "rotted" flooring that

3

would "sink in some areas" and an inaccessible front door. Regarding the lack of lighting in the house, Hernandez testified, "The windows were covered. Natural light was extremely limited. The living room and kitchen area did not have any light bulbs, along with the other rooms in the home." With the assistance of his flashlight, Hernandez took photographs of the house, copies of which were admitted into evidence. Hernandez did not believe the house was safe for children, based on its "extremely limited lighting, the rotted floor, the power surge being out in the open near where [he] found the child's bed, and only one door being accessible. Potential hazards for a child, in my opinion."

Following this incident, a referral was made to Child Protective Services (CPS). Jorge Rodriguez, a CPS investigator, testified that he began his investigation by attempting to contact the parents on March 16, 17, and 19, 2021. On March 19, Mother returned Rodriguez's phone call and agreed to meet with him at her house. Mother allowed Rodriguez to enter the house through the back door and spoke with him in the kitchen area, but she did not grant him permission to view the rest of the home or conduct a home assessment. After speaking with Mother and later Thibodeaux, the paramedic who had treated Father, Rodriguez sought and obtained an emergency removal of Daughter from the home. Shortly thereafter, the Department filed suit to terminate Mother's and Father's parental rights and later filed a motion for a finding of aggravated circumstances, which the district court granted. *See* Tex. Fam. Code § 262.2015 (providing for accelerated trial schedule when trial court makes finding that any aggravated circumstances, including endangerment, were present in case).

4

At the beginning of the case, hair follicle drug tests were performed on Daughter and Mother.[2] Daughter tested positive for methamphetamine, and Mother tested positive for amphetamines, methamphetamine, and marijuana. Copies of the drug-test results were admitted into evidence.

CPS caseworker Roxanne West was assigned to the case. West testified that when she first received the case, her primary concern was Mother's and Father's substance abuse, although she later identified other concerns that included mental health, lack of parenting skills, and possible domestic violence due to statements that Mother had made to West regarding Father "holding her back" from completing services. However, when West questioned Mother and Father regarding domestic violence, "they both denied it" and "both maintained that there's never been domestic violence between the two of them."

West testified that Mother and Father admitted to using methamphetamine and that Father also admitted to using marijuana. West added that Mother admitted using methamphetamine while she was pregnant with her older child, who had been adopted by her mother following a previous CPS case.[3] When West asked Mother and Father "the last time they had used," they told her that "it hadn't been that long ago. Mom said that she was stopping—or that she had stopped, I want to say, around February. They both said that they wanted to get

---

[2] A hair follicle test was ordered for Father, but it was canceled because he had insufficient hair to test.

[3] The removal affidavit (a copy of which was not admitted into evidence but has been included in the clerk's record) alleged that Mother's CPS history included a 2016 case involving allegations of drug use while caring for her older child. In that case, Mother admitted to using methamphetamines generally every day for years. Mother voluntarily relinquished her parental rights to her older child.

5

clean." West testified that addressing their drug use was a requirement in each parent's family service plan. She explained,

> We put that an OSAR [Outreach, Screening, Assessment, and Referral] evaluation would be required. And they would have to follow any recommendations that OSAR made, to include in-patient [treatment]. I also have in there that they are required to take random drug tests; that I would notify them first thing in the morning, and it would have to be done before the end of the day. We talked about letting me know within 24 hours any time they had a phone or address change, so that way I would be able to contact them for their drug tests.

Mother tested negative for drugs on May 12 and July 28, 2021. However, Mother failed to appear for nine other scheduled drug tests during the pendency of the case.

Other services included psychological evaluations, individual counseling, parenting classes, maintaining employment, and maintaining a home that was safe and stable for Daughter. West testified that Mother failed to complete any of her services prior to trial, which began on July 20, 2021, and was continued to August 9, 2021. West acknowledged that Mother had begun drug treatment in late July 2021 and that Mother claimed to have begun parenting classes at around the same time, but she faulted Mother for not beginning services sooner. West explained that neither parent had alleviated her concerns regarding their substance abuse.

Regarding the relationship between Mother and Father, West testified that "they have been off and on for a while. They get back together, they split up, they get back together." West believed that Father had been "more of the primary caregiver" for Daughter and that he was "more bonded" with Daughter. When West asked Mother about any of Daughter's "milestones" that she had observed, Mother told her that "since she didn't raise her older child, that she really didn't know what to look for." In West's view, "[i]t seemed like [Mother] had a really difficult time bonding with [Daughter] after losing her first child."

6

West testified that when she first met Daughter, "She did not make eye contact. She didn't respond to her name. I tried to get down on the floor and play with her, and she really didn't engage." West added that Daughter "had a hard time . . . communicating her feelings" and that "all she could do was cry for long periods of time and hit her head because she didn't know how to express or communicate her feelings." Additionally, West testified that Daughter was underweight for her age.

Daughter's first placement following removal lasted approximately one month in April 2021. Abigail Gonzales, the first placement, testified that when Daughter first came to live with her, "she had tremendous amounts of lice" in her hair. Gonzales was a schoolteacher who had "seen lots of kids with lice," but she had "never seen that much lice . . . in [her] life." During her time in Gonzales's care, Daughter would engage in self-harming behavior, including hitting her head against the wall and floor, hitting herself in the arms, chest, and face, and running "full force" into the baby gates. Gonzales further testified that bath time "seemed very traumatic for" Daughter and that she would kick, scream, and hit Gonzales and her husband while trying to get out of the bathtub. Daughter also was unable to feed herself, did not want to play with the other children in the house, appeared developmentally delayed with her speech, and was malnourished, according to a doctor with whom Gonzales had spoken. At the end of Daughter's time in Gonzales's care, Gonzales began to see some improvement in Daughter's behavior.

Daughter's current placement, which began May 14, 2021, was with Samantha Speaks. When asked what changes she had seen in Daughter since she first came into her care, Speaks testified, "I've seen her grow in her speech, in her behaviors, in her communication. Just overall, she's done really well." Additionally, Speaks had begun bathing Daughter in the kitchen

7

sink, "where she's playing and enjoying toys and we can pour water over her hair now. And she asks to get a bath now versus screaming." Regarding Daughter's speech difficulties, Speaks testified that Daughter had been seeing a speech therapist twice a week and that "now we can carry on a conversation." Speaks had arranged for Daughter to attend occupational therapy twice a week and play therapy twice a month. Daughter was now affectionate toward others, "was great with numbers," and "loves to play with other kids." Speaks testified that she was bonded with Daughter and was willing to be a long-term placement for her. When asked if she would be willing to adopt Daughter, Speaks testified, "If that's an option, we're open to it. We are here for whatever is in her best interest."

Mary Pat Coco, the CASA advocate for Daughter, testified that Daughter was in a "very safe and loving home right now" and that she had seen many positive changes in Daughter's behavior following removal: "She's a different child. She is affectionate. She's laughing. She's smiling." Caseworker West similarly testified that Daughter seemed like a "different kid" in her current placement. West explained,

> She just seemed so happy. She's talking so much. They do all sorts of stuff. This summer they went to NASA, the aquarium, the zoo. They're constantly sending me pictures of her doing things. And it's just been—it's just been a really, really good change for her. It really—like, I'm seeing a different kid. She loves reading books. And she talks a lot now. So, she's—she's doing amazing.

Father did not testify at trial, but Mother did. Mother testified that she had separated from Father on July 14, 2021, because she "wanted to get help" and "wanted to get away and actually begin services for [her] daughter." When asked why she did not separate from Father and begin her services sooner, she answered that there were times where she "couldn't leave the home at all" and "was sometimes—not, like, being held captive, but being held there in

8

[her] room." When asked how Father was "holding her back" from services, Mother testified, "I mean, pretty much physically and, like, emotionally and almost in any way possible. I mean, in any way possible." Mother testified that she did not have transportation, a phone of her own, or "communication with anybody" until July 14, when she found Father's phone in the bathroom, called her sister and told her to "come get [her]," packed up her things, and left. Mother testified that since that time, she has been staying with her parents and starting her services. Mother testified that she was employed with Caterpillar, taking online courses to obtain her high school diploma, involved in a rehabilitation program called Rise to Recovery, enrolled in parenting classes, and attending Narcotics Anonymous meetings.

Mother acknowledged that she had not yet begun some services, including a psychological evaluation that she claimed to have scheduled for after trial, on October 5, 2021, and her OSAR drug-and-alcohol assessment. Mother also acknowledged that she had been in an "on-and-off relationship" with Father in the past but that she was committed to not returning to Father this time so that she could obtain reunification with Daughter. Regarding her drug use, Mother admitted that she had been using methamphetamine for approximately eight years, beginning when she was sixteen years old and before she met Father. Mother also acknowledged that she had missed nine drug tests during the case but claimed that she had not been aware of them because she "had no phone."

At the conclusion of the bench trial before an associate judge, the trial court found that termination of Mother's and Father's parental rights was in the best interest of Daughter and that Mother and Father had: (1) knowingly placed or knowingly allowed Daughter to remain in conditions or surroundings which endanger the physical or emotional well-being of the child and (2) engaged in conduct or knowingly placed Daughter with persons who engaged in conduct

9

which endangers the physical or emotional well-being of the child. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (2).

Mother and Father requested a de novo hearing, which was held in September 2021. Caseworker West testified again at the hearing. When asked to provide an update as to what services Mother had completed since the last trial setting in August, West testified, "I don't have any information that she has completed anything since the last trial date. I sent her to a couple drug tests and I haven't received any responses." West also testified that she had been told that Mother was "staying with her mom" because "[s]he was trying to separate herself from the situation she was in with [Father]." When asked how Mother had explained "the situation" to her, West testified, "She stated that it was a hostage situation. That she was being basically held against her will" and that Father had "impeded her ability to work services." West testified that she had visited the home of Mother's parents trying to get in touch with Mother, but she had been unable to contact her.

West did not believe that this was an appropriate case for reunification because "[n]either parent has done anything to show that they are trying to make the home safe or stable for [Daughter]. None of the concerns that brought [Daughter] into care have been mitigated by any of the services or anything that they should be doing to better themselves for [Daughter]." West further testified that Daughter was "doing amazing" in her current placement. She explained, "Every time I see her there's more growth. When I first met her she didn't make eye contact. She didn't talk. Now she engages you. She talks. She shows me her books. She's getting services. The foster parents have done amazing things with her." West also testified that because Mother had not addressed the Department's concerns, if Daughter were returned to Mother, it "just wouldn't be a safe situation for [Daughter] at all" because they "would be . . .

10

putting her right back in the same situation, being exposed to methamphetamines, living in a home that is not appropriate for animals."

After taking the matter under advisement, the district court made the same findings as the associate judge and ordered that Mother's and Father's parental rights to Daughter be terminated. This appeal by Mother followed.

## STANDARD OF REVIEW AND GOVERNING LAW

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the child's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are

11

strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id*.

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id*. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

**Endangerment**

In this case, the statutory grounds for termination were that Mother had endangered Daughter under Section 161.001(b)(1)(D) and (E). Termination of the parent-child

relationship may be ordered under subsection (D) if clear and convincing evidence establishes that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," Tex. Fam. Code § 161.001(b)(1)(D), and under subsection (E) if the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id*. § 161.001(b)(1)(E). These grounds are intertwined; subsection (D) focuses on the child's environment—which includes the child's living conditions and the environment produced by the conduct of the parents or others in the home—and whether the environment itself endangered the child, while subsection (E) focuses on the parent's conduct and whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *S.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00085-CV, 2021 WL 3437890 at *11 (Tex. App.—Austin Aug. 6, 2021, no pet.) (mem. op.); *see In re C.V.L.*, 591 S.W.3d 734, 750 (Tex. App.—Dallas 2019, pet. denied). Both subsections require proof of endangerment, which means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.C.*, 577 S.W.3d at 698-99. A finding of endangerment requires more than the threat of metaphysical injury or possible ill effects from a less-than-ideal family environment, but the Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699.

**Best interest**

When deciding the best-interest issue, we consider the well-established *Holley v. Adams* factors, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

**DISCUSSION**

In a single issue on appeal, Mother challenges the sufficiency of the evidence supporting the district court's findings that she endangered Daughter and that termination of her parental rights was in the best interest of Daughter. However, rather than address those findings separately, Mother makes a single argument that she claims applies to each finding. Specifically, she contends that "uncontroverted evidence and testimony of duress, arguably rising to unlawful restraint, applied via the lattermost *Holley* factor [i.e., acts and omissions of the parent and any excuses for her conduct], mitigate in favor of a parent and warrant a new trial in a governmental suit for termination of parental rights." In other words, Mother claims that she was not "culpable" for her conduct because "she was held 'captive' in her room by the Respondent Father, and was not allowed to have a telephone, transportation, or money." This "captivity," she contends, was established by her "unchallenged" testimony that Father was preventing her from completing her services and Deputy Hernandez's testimony and photographic evidence

14

tending to show that there was a chain bolted to the outside of Mother's bedroom doorframe.

Therefore, according to Mother,

> The question thus begged is whether any "reasonable factfinder," in light of the foregoing evidence, could possibly find "clear and convincing" evidence that termination is warranted in this case.

> Appellant would respectfully suggest the analysis of this issue is not one of mental states, but rather one of volitional vs. non-volitional "acts and omissions," and respectfully invites this Honorable Court to consider and discuss this rather arcane and gray interstice of termination law, and in the interests of justice, reverse and remand the case back to the trial court for a new trial.

Mother makes no other argument for why the evidence was insufficient to support the district court's findings.

Initially, the trial court did not have to believe Mother's testimony that Father prevented her from starting services, and we are to defer to the factfinder's determination that Mother's testimony was not credible.[4] *See In re J.F.-G.*, 627 S.W.3d at 311–12; *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003). Although Mother contends that her testimony was

---

[4] At the conclusion of trial, the associate judge explained on the record:

> I don't buy the being held against your will thing. I don't buy that. You had many opportunities to get help. You came to court four times, and you could have told me in court, hey, I'm scared. [Father] isn't letting me do my services. [Father] is the reason I'm doing—you never did that. You had the opportunity every time an investigator from the Department came. You had the two individuals that testified about the March 14th incident. Police officer and—or a law enforcement officer and the paramedic. I just don't know how many times you talked about your mother giving you medicine for your child's lice. You talked about going to the doctor for your child's lice. It's very difficult for me to accept that [Father] is the reason that you haven't done anything until the last three weeks.

15

"unchallenged," when caseworker West was asked about what she thought Mother meant when she told West that Father was "holding her back," West testified, "That they were in a relationship and he was holding her back from doing better. And that she finally decided to leave. So, she left one day with her sister." West added,

> She didn't say anything about him, like, physically hurting her. But she said that for a while she—she lost her phone. She didn't know where it was; that it was possible that he took it from her. But all she said was that it was possible that he took it from her. She wouldn't just straight out say that she felt like he was hiding it from her.

Regarding Mother's testimony that she lacked transportation, West testified,

> She may have mentioned that [Mother and Father] had to share a car. That was about it, though. I don't think she said that she had absolutely no access, because she was able to get a ride there from her sister and she was able to get picked up from her—from the home. Which also wasn't just [Father], . . . it was also the grandfather in the home as well. And I believe [Father's] mom also came in and out. So, she had access to other people.

Additionally, when Mother was asked to explain her testimony that she "couldn't leave the home at all," she clarified that "sometimes" she was held in her room but that she was "not, like, being held captive." Mother also admitted on cross-examination that she had used the phone to schedule her psychological evaluation (which, she acknowledged, Father had not prevented her from doing) and that she "actually couldn't drive the car at all because [she] couldn't drive standard."

Moreover, the statutory grounds for termination were not that Mother failed to complete her services, *see* Tex. Fam. Code § 161.001(b)(1)(O), but that she endangered Daughter. Although the failure to complete services may be relevant to a finding of

16

endangerment, *see, e.g.*, *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.), the evidence of endangerment in this case was based primarily on Mother's drug use and the environment in which Daughter was placed.

Mother testified that she began using methamphetamine when she was sixteen years old, before she met Father, and that she had been using methamphetamine for approximately eight years, including when she was pregnant with her older child. Mother presented no testimony or other evidence that Father forced, coerced, or otherwise pressured her to use drugs, and the district court could have reasonably inferred that Mother's eight-year history of drug use was voluntary. At the beginning of the case, Mother tested positive for amphetamines, methamphetamine, and marijuana. Daughter also tested positive for methamphetamine at the beginning of the case, which the trial court could have reasonably inferred was the result of Daughter's exposure to Mother's methamphetamine use. *See In re J.L.B.*, 349 S.W.3d 836, 847–48 (Tex. App.—Texarkana 2011, no pet.) (children's exposure to parent's drug use to extent that children "actually tested positive" for drugs supported endangerment finding). Although Mother tested negative for drugs on two occasions during the pendency of the case, she missed nine other scheduled drug tests, and caseworker West testified that she contacted Mother in advance via text messages to inform her of the tests. The trial court could have reasonably inferred that Mother missed those tests not because she "had no phone" as she claimed, but because the tests would have been positive. *See In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied) ("A factfinder may reasonably infer from a parent's refusal to take a drug test that the parent was using drugs."); *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.) ("The trial court could reasonably infer [appellant] avoided taking the drug tests because she was using drugs."). Additionally, at the de novo hearing,

17

caseworker West testified that she had scheduled Mother for two additional drug tests, after Mother had separated from Father and was living with her parents, but she had received no response from Mother. From this evidence, the trial court could have reasonably inferred that Mother had chosen not to take the tests by her own volition.

The Department also presented evidence that Mother had endangered Daughter by placing her in an unsafe environment. Mother told Deputy Hernandez that Daughter was in the house when Father collapsed from what Hernandez and paramedic Thibodeaux suspected was a drug overdose, and the trial court could have reasonably inferred that Daughter's presence in the home then had endangered her. Also, because Mother and Father admitted that they had been using drugs, and Father's collapse from a suspected drug overdose occurred at the house where they lived with Daughter, the trial court could have reasonably inferred that Daughter had been exposed to Mother's and Father's drug use when she was in their care. This finding is further supported by the evidence showing that Daughter tested positive for methamphetamine when the case began.

Also, there was evidence tending to show that the house where Mother and Daughter lived was not safe, either apart from or possibly because of the drug use. Thibodeaux testified that the house was "very shabby" and did not appear to be a "maintained structure," with "the side of the building being very weak and almost breaking" from Thibodeaux's efforts to open the front door, which caused the "whole side of the building" to "shake." Thibodeaux also testified that there was a "lack of light" in the building that "made everything very dark and not very accessible." The lack of lighting was confirmed by Hernandez, who testified that "[t]he windows were covered," "[n]atural light was extremely limited," and "[t]he living room and kitchen area did not have any light bulbs, along with the other rooms in the home." Hernandez

18

also testified that the house had "rotted" flooring that would "sink in some areas," an inaccessible front door, and, in the bedroom where Daughter slept on a mattress on the floor, Hernandez observed "a power surge protector on the floor with multiple electrical cords going into it" and "a blanket draped over it." These were all "[p]otential hazards for a child," Hernandez noted. With the assistance of his flashlight, Hernandez took photographs of the house that were admitted into evidence, and these photographs corroborated his testimony regarding the conditions inside the house. Further, Hernandez agreed that the conditions inside the house were not sanitary, and this observation was supported by the testimony of Daughter's first foster mother, who testified that when Daughter came into her care, "she had tremendous amounts of lice" in her hair. Additionally, at the de novo hearing, West opined that the home "was not appropriate for animals." The trial court could have reasonably inferred from this evidence that Mother had placed Daughter in an unsafe and unsanitary environment that had jeopardized Daughter's physical and emotional well-being. Moreover, Mother did not contest any of the evidence tending to show that the home was an unsafe and unsanitary environment for Daughter. We conclude that the evidence is legally and factually sufficient to support the district court's findings that Mother endangered Daughter under Section 161.001(b)(1)(D) and (E).

Turning to the best-interest requirement, Mother's sole argument, again, is that her acts and omissions should be excused because Father held her "captive" during the case. But even if the trial court had found this claim to be credible (which it apparently did not), it would excuse, at most, Mother's failure to complete her services. It would not excuse her admitted history of drug use, including when she was pregnant with her older child, or her placement of Daughter in an unsafe home. Additionally, a parent's acts and omissions are only one of several factors relevant to the best-interest analysis. Mother fails to contest the evidence supporting the

19

other factors, including evidence showing that: (1) when Daughter was removed from Mother's care, she had significant behavioral issues including self-harm, suffered developmental delays such as speech impairment, tested positive for methamphetamine, was malnourished, and had "tremendous amounts of lice" in her hair; (2) even after Mother had separated from Father, Mother continued to miss drug tests, failed to take her OSAR drug-and-alcohol assessment, failed to communicate with her caseworker, and scheduled her psychological evaluation for October 2021, two months after her trial date; (3) Mother "had a really difficult time bonding with [Daughter] after losing her first child," and she told West that she "really didn't know what to look for" regarding "milestones" in Daughter's development; (4) Daughter's current foster mother, Speaks, was bonded with Daughter, was willing to be a long-term and adoptive placement for her, and was "here for whatever is in her best interest"; (5) Speaks had arranged for Daughter to see a speech therapist twice a week and to attend occupational therapy twice a week and play therapy twice a month, which had improved Daughter's communication abilities, behavioral issues, and social skills; (6) according to West and the CASA volunteer, Daughter was in a "very safe and loving home right now," was "doing amazing" in her current placement, and had undergone many positive behavioral changes following removal; and (7) according to West, it would not be safe to return Daughter to Mother because Mother had failed to address the Department's concerns.

On the other hand, there was some evidence that Mother had begun some of her services and, at the time of trial, had made recent improvements. Specifically, Mother testified that she had separated from Father, was employed, was taking online courses to obtain her high school diploma, was involved in a rehabilitation program, was enrolled in parenting classes, and was attending Narcotics Anonymous meetings. However, we cannot say that this contrary

evidence of recent improvement is "so significant" that the factfinder could not have formed a firm belief or conviction that termination of Mother's parental rights was in Daughter's best interest. *See In re J.O.A.*, 283 S.W.3d at 346 (explaining that "evidence of improved conduct, especially of short duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices"). We conclude that the evidence is legally and factually sufficient to support the district court's best-interest finding.

We overrule Mother's sole issue on appeal.

## CONCLUSION

We affirm the district court's order terminating Mother's parental rights.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed: March 4, 2022

21